Good morning, Your Honors. May it please the Court. Caleb Mason representing Ms. Ortega, the defendant and appellant in this case. I'd like to reserve two minutes for rebuttal. In this case, I would like to start as almost an epigram with a comment you made a moment ago, Judge Duffy. Did anybody bother to look at state law when adjudicating this issue in a federal criminal trial of a state law rule? In this case, the answer is no, despite the defendant's motion pre-trial to give full faith and credit under 28 U.S.C. section 1738 to a judgment by a California court and a Burke registration issued in accordance with that judgment. The district court denied the motion. The case went to trial with no mention of California law. And the key fact that the government relied on through its lead agent, Agent Nixon, and also in closing argument was the failure of my client, Ms. Ortega, to tell the superior court judge, whom she had applied to for a delayed registration of birth, that she had previously been deported. The government laid great stress on that fact. Its agent indeed said that he had personally reviewed the submissions to the superior court and found them lacking. He said the registration of birth was invalid, that nothing of significance was admitted in front of the superior court. And yet, as I explained in my briefs, Ms. Ortega complied fully and completely with California law. She met every requirement that California imposes for applying for a registration of birth. The document that she's not being tried for violating California law. Well, that's right, Your Honor. She's being tried for violating two sections of Federal criminal law, and the government's theory as to both of those charges was that she had lied to the State court judge in being the government's theory was that she made a false statement in her passport application. Now, she may have entirely complied with California law, but if she knew that, although complying with California law, she wasn't actually a United States citizen and she obtained through California law that delayed registration of birth, that doesn't speak at all to the question of whether or not she made a false statement if she knew that she in fact wasn't born in the United States and wasn't a native United States citizen. That's correct, Your Honor. In fact, I think, I mean, I understand the general relevance of your argument, but the emphasis upon whether she'd violated a California statute seems to me to miss the point. She may not have violated a California statute. She may also know that she's not a United States citizen. So, Your Honor, I'm sure members of this case, you were on the panel that reversed her immigration deportation order in the prior ruling last spring based on what was said. I confess I don't recall the case. You made a comment in that case that I have since repeated to my students because it's stuck with me. And what you said was this woman, my client, had at the time a document that was unequivocal documentary evidence, the same as the President of the United States has, that she was born in the United States. What she had was a birth certificate or a registration of birth issued by the State of California. Nobody had ever challenged that. She had met all the requirements that California requires. That was an ex parte action. She never gave notice to the Federal Government of Immigration that she was going to do that, did she? Well, sir, she was following the yes or no. Did she give notice to the Federal Government? She gave notice to no one. She applied for the California court through her husband, who is an attorney in immigration matters, without giving notice to the INS or the ISIL that she was going to try to establish her American birth, right? I think I would contest the notice issue. She gave notice in that as soon as she received this document, she immediately began applying for passports. Give notice to the Federal Government that she was attempting to establish her California birth before she went to court. No, not before. But as to that, again, I would go back to the same theme as with the registration of birth itself. There's no affirmative requirement to do so. But it also means that it's an ex parte proceeding. It's unopposed. It's not really very probative of anything. So she can argue, and obviously did argue in this case, that I thought I was a U.S. citizen. But she didn't successfully persuade the finder of fact that she was a U.S. citizen. And the delayed registration of birth was admitted in evidence. It was part of her argument. It just wasn't very probative because it was obtained in a way that was one-sided. She told the California court, I was born here. Here are a few declarations. Okay. Here's your certificate. Does it really count for anything? It turns out the jury decided that it didn't. Well, the government made more argument than that. And we would not be here if the government's case had been limited to the testimony of Margarita Lancaster saying, I was there, it was my house, and my sister didn't give birth in my house. And the jury had decided to believe her. That would have been fine. We're not challenging that. The government also said that the document itself, the registration of birth, was invalid because there were material omissions from the submission to the State court. Whether it was valid or not really isn't the question. Well, I can understand the terminology. The question whether it was probative, whether it could be held up and say, well, because they said so, it must be true. Well, just because you read it on the Internet doesn't mean it's true. Just because you get a California court to issue a registration in an ex parte proceeding doesn't mean that it's true. Well, with respect, Your Honor, I would say that a judgment by a State court of a sovereign State is a little bit different from something one reads on the Internet. And I have no doubt that argument was made to the jury. Kennedy, I'm sorry. Counsel, doesn't California Health and Safety Code 10,000 or 103,450 create a presumption? A presumption? Can't a presumption be overcome? It can be. And wasn't it overcome hereby? Wasn't there evidence contrary to that presumption? Your Honor, if there was. Was there evidence contrary to the presumption? There was. Was the jury capable of appreciating that the evidence overcame the presumption? I would say no, Your Honor. Why is that? Because the evidence that the government submitted was of two kinds. One was testimony from Margarita Lancaster. She's a percipient witness. She said, this was my house and this woman was not born in my house. She was an infant when my sister brought her to visit me. We're not contesting that evidence. Doesn't that get rid of the presumption right there? If she's a credible witness, the testimony of one witness worthy of belief can establish any fact. We often instruct juries that way. Well, Your Honor, the jury was also told through the ---- Wasn't that enough under Jackson v. Virginia to carry the rebuttal, rebutting of the presumption? I would say no, Your Honor.  Well, that's a harmless error inquiry. We would have to ask, because if we established that it was error under Section 7. It wasn't error to put Lancaster on the stand. It wasn't error to ask her those questions. She's a percipient witness. This girl was not born in my house, period, right? That evidence by itself, doesn't it rebut the presumption? No, Your Honor. I don't think it ---- As a legal question, why does that evidence, if worthy of belief, why does it not rebut the presumption? I don't think of it, I can say, that a jury could separate out the erroneous testimony that it got about the California registration of birth from its evaluation of the percipient witness testimony. Oh, you're saying that the jury was improperly instructed that the California proceeding was not a presumptive presumption of birth in California? Not instructed by the Court, Your Honor, but testified to by the government's testimony in closing. The government held up the document and said, look at this. It's not a birth certificate. It's a registration of birth. The government's witness, Agent Nixon, said that he had conducted his own independent review of the materials that the State court had seen, and he decided that they were insufficient. He said the State court did not get to see everything it should have seen. Was there an objection to that testimony? Yes, there was. There were objections made ---- On the ground of? On the ground that Agent Nixon's not competent to give that type of testimony. There was also the ---- Why not? Because he's not an expert in State law issues. There was also ---- In other words, the opinion rule. He's not qualified to give an opinion. That was the trial objection, but yes, Your Honor. But the primary objection that we're relying on here was the motion in Limine under 1738 to give full faith and credit to the California State judgment. And once that motion had been made and denied, as it was, and you can see the extensive district court order at 7 through 12 of the record. Exactly. That seems to be an easy one to me, because California law makes it a presumption. It doesn't make it a rebuttable presumption. So it's fair play. I agree, Your Honor, that it is fair play. But fair play also requires that when the presumption is rebutted, it must be done consistent with State law. Section 1738 requires that if the Federal government is going to attack a State court judgment, it must do so in the manner that would be permissible in State court. And I submit that in State court in California, one could not make any of the arguments that the government made through Agent Nixon's testimony, that the State court had not heard about the immigration proceedings. The State of California's evidence is supposed to be a State court trial. I don't understand the notion that California law creates a presumption, so everything after that has to operate under California law. I don't think that's the case. The Federal court recognized the presumption, and now it's a trial in Federal court under Federal rules to decide whether that presumption carries the day, and the jury decided it didn't. The jury didn't hear a crucial piece of evidence, though, which is that a State court issuing a delayed registration of birth does not need to get evidence beyond what the State code requires, which is one piece of documentary evidence and two pieces of testimony in the form of affidavits. Well, frankly, I'm not sure what the relevance of that is, because that, again, goes to the question of whether California law was complied with. And the issue in the Federal trial is whether or not she thought she was a U.S. citizen. So the delayed registration of birth may be a presumption, and she can argue, because of that, I thought I was a U.S. citizen. But if she knew she wasn't, the fact that she'd managed to obtain a delayed registration of birth doesn't really change the underlying factual issue presented to the jury. Well, Your Honor, I think we run into the skilling issue that I raised in my brief with the United States v. Skilling, that is, the permissibility of the government creating what the Supreme Court called these free-floating theories of fraud that float about untethered to State law. Was there any doubt that the fraud that was alleged was that she asserted she was a United States citizen and that she knew that she wasn't? That was the fraud that was alleged. But the evidence is pretty clear. What's free-floating is that there are hundreds of thousands, if not millions, of people in this country who possess documents of the sort that she possessed. And if this Court endorses what the government did in this case, then all of those people could be charged criminally with any kind of fraud relating to that document. I can be charged criminally. I've got a birth certificate that I think says I was born in Massachusetts. But if I knew that I wasn't and I tried to use that birth certificate in a formal fashion, I can be charged. The fact that we have the documents doesn't really change anything. Your Honor, the primary evidence that the government relied on to prove that Ms. Ortega knew she was not entitled to this birth certificate was the fact that she did not tell the State court about her prior deportation proceedings. Ms. Lancaster said that. No, I don't think that was the – that wasn't the proof of the fraud. That was the proof, the argument given by the government as to why this certificate shouldn't be treated as compelling and persuasive as to the fact that, well, gee, she really is a citizen. Your Honor, the only other evidence was Ms. Lancaster's testimony, which I submit cannot have been sufficient under any standard to convict her on the fraud charges, because Ms. Lancaster's testimony goes to a period of time when she was at most two or three months old. She doesn't have an independent memory of her birth. She relies on what she was told. She does not have any memory herself. Therefore, Ms. Lancaster's testimony cannot go to her mens rea at any time after she'd been issued this document. As we argued in our papers, she was issued a birth certificate by California. That birth certificate was never challenged, regardless of the fact that it was an ex parte proceeding. And you're quite right about that, Judge Gabbard. She knew before then that her – her location of birth was at issue and that at least the Federal government took the position she was not born at Ms. Lancaster's home, that she was not born in the United States. Isn't that true? That's true. Now, nobody really knows where he or she is born, because you're not conscious of things. You're dependent upon what people tell you. And that makes for a powerful argument for the defense. But the jury must have concluded that she's known because of the challenges. It's not out of the blue that there's a question about this, that she knew enough about her life, that she filed papers previously that indicated she was not born in the United States. That she knew at that time she was not born in the United States. I mean, all of this strikes me as, yeah, there's a decent defense argument in there and the jury might have been persuaded. But I don't see how it can be said there wasn't sufficient evidence to justify or to support a conviction in light of what the jury decided. We're compelled to look at it in the light most favorable to the government. Your Honor, the jury has to evaluate her mens rea at the time after she got this birth certificate from California. And I would like to reserve the remainder of my time for rebuttal, but I would submit on that, that she's in a position that millions of people are in. They followed the rules. They got the document. They're entitled to rely on that without being accused of fraud on that basis. Okay. I helped use up your time, so I'll still give you your two minutes for rebuttal. Thank you. And we'll hear from the government. May it please the Court. Matthew L. Trangham on behalf of the United States. Good morning. The government's position is simple. There was sufficient evidence to show that this individual, the defendant, was a citizen not of the United States, but actually of Mexico. The United States relied on multiple documents and actually on multiple witness  One of the documents relied upon by the government was that the defendant 1996 birth registration in Mexico. That birth registration predates any and all other documentary evidence that was either created by or submitted by whether the government or the defense to show the defendant's date of birth and location of birth. Additionally, the government relied upon the immigration court's findings. Let me ask you about the registration of birth. What evidence was there that the defendant had any part in that registration? In the 1996? No. I'm sorry, in the 1976. There is no indication that the defendant herself had any part in the registration, but the evidence showed that the defendant's mother and the defendant's aunt both signed that registration in Mexico swearing to the Mexican officials that she, the defendant, was born in Mexico. That was Ms. Lancaster? No. Ms. Lancaster is the defendant's aunt. The defendant's mother is Irma Ortega and the defendant's aunt who signed the registration was Maria Esther Gallego. Those two ladies signed both the 1976 birth certificate and the 1980 birth certificate, both in Mexico, stating that the defendant was born in Sonora, Mexico. So how does that speak to defendant's state of mind? The defendant's state of mind is shown by a few different things. First is that the defendant applied for and obtained a Mexican birth border-crossing card in 1995. That border-crossing card was the same border-crossing card that the defendant used to cross the international border in 1997 when she ran into the immigration problems. And only foreigners can apply for border-crossing cards? Americans can't do that? Technically, yes. But to be more specific to the Court, only Mexican nationals can apply for the border-crossing card and only those Mexican citizens living on the border of California, Arizona, and Texas, and I believe New Mexico, are eligible to apply for and obtain those cards. What's the area in which they can apply? I'm sorry. Living on the border, within 5 miles, 10 miles? I don't know the specific geographic distance down from the United States border, but it's relatively close to the border. Okay. The hard part for me in this case may have been summarized by, I guess it was Judge Campbell who said at some point in the context of sentencing that it looks like she still believes that she's a United States citizen or still believes she was born in Monterey Park, I forget the town. In Monterey Park, yes. And do you know where you were born firsthand? Firsthand, no, Your Honor. Now, isn't that really part of the problem with this kind of question, to charge somebody with fraud that is knowing where you're born? Yes, Your Honor, it is. It poses a difficulty for the government, but in this case, there is a unique factor and a couple of unique factors that I spoke to briefly. The first was the border-crossing card. The second was a testimony of Ms. Margarita Lancaster and Ms. Veronica Beyer. Ms. Margarita Lancaster is the defendant's aunt. In 1998, Ms. Lancaster testified at trial that she received a letter from the defendant while the defendant was incarcerated, and that letter from the defendant to Ms. Lancaster requested that Ms. Lancaster do something that Ms. Lancaster did not want to do, specifically say that she was born in her house. Ms. Lancaster was adamant that no one was born in her house, whether it was at 607 West Harding Avenue or I believe it was 621 West Harding or 622 West Harding Avenue. So the evidence there shows that there's a defendant making an actual overstep in 1999, which is after she's gone through her immigration court proceedings and saying, please help me, and this is what I want you to do. I'm asking you to say that I was born in your house so that your story will match up with my mom's story, which will now match up with my other aunt's story. And my mom and my other aunt, being Ms. Gallegos, are the two that signed my birth registration down in Mexico. So that's where the government is getting its knowledge requirement for this particular defendant. It comes from the defendant's own actions. Was that letter ever introduced in evidence? The letter was not introduced in the evidence. The letter was... Referred to by Ms. Lancaster. It was referred to by Ms. Lancaster. It was disclosed to the defense. The government did not obtain the letter until during trial, and we made the decision not to introduce it during trial. So we just relied on it as extrinsic evidence, not as actual documentary evidence. This is merely a tangent, but a curiosity impels me to ask, what difference in the ultimate sentence was made by the false statement counts? I might be able to unpackage it myself, but I haven't. And if you haven't, that's fine. I hear what you're saying with regard to sufficiency of the evidence, but it does trouble me some, and apparently troubled Judge Campbell enough in sentencing. I'm wondering if the sentence he gave was affected by his sense that, okay, I'm not going to set aside those convictions or grant a new trial, but in effect I'm not going to sentence with reflection or with those counts either. Your Honor, I do not know, and I believe it was Judge Zapata that we were talking about. Oh, I'm sorry. That's okay. Okay. I believe Judge Zapata started out when it was his turn to pronounce the sentence, and one of the first things in the first 30 seconds, Judge Zapata said exactly what this Court was asking both myself and Mr. Mason. How is it that anyone knows where they're... That's really where Judge Zapata focused. I have no idea how it affected his sentence, if it affected his sentence at all. If there are no further questions, I would submit on the briefs. Thank you. Thank you. Mr. Mason. Thank you, Your Honor. Very briefly, with respect to the evidence to which the government alluded, it is entirely possible that a jury could have credited Ms. Lancaster's testimony and decided that Ms. Ortega was not born in her house, perhaps born in Mexico. Who knows? But the crimes that she was charged with have scienta requirements. They have mental state requirements. Those mental states must have been proven for the times when the crimes were allegedly committed. How do you get around the crossing card? If only Mexican nationals can apply for a crossing card, and your client applied for a crossing card, how do you get around the fact that she knew she was a Mexican national? So, Your Honor, we addressed this at some length in the blue brief. In fact, the U.S. State Department recognizes and has extensive discussion of it on its website, in its official literature, on dual citizenship. There are millions of people who are entitled to Mexican citizenship and U.S. citizenship. And, in fact, as we explained in our brief, under Mexican law, those people have to declare themselves as Mexican citizens. Under U.S. law, they have to declare themselves as U.S. citizens. It is not an anomaly at all that a person could be entitled to both U.S. and Mexican citizenship and apply for a Mexican border crossing card. But the Mexican border crossing card is used by the American authorities, correct, to allow Mexicans into the United States. That's right. American citizens don't need that. That's correct, Your Honor. And the testimony, both in the immigration court and at trial, was that my client did not know or did not understand this distinction, that she had been told early in life that she had been born in the United States, but it was not until she was in immigration proceedings herself that she understood that she was going to be required to document that. She did not know that there was going to be any subsequent waiver of her U.S. citizenship when she applied for the Mexican border crossing card. She grew up in Mexico. It's what everybody did. They applied for a border crossing card. If she had an entitlement to U.S. citizenship, that entitlement is not affected at all by the fact that she applied for the border crossing card, nor does it affect her mens rea. The mens rea question has to be answered with respect to what she knew as of 2005. And what she knew at that point was that she followed the rules. She did what Immigration Judge Mullins told her to do. She went, she applied for the document, and she is entitled to rely on it, as we all are. And I would submit on that, if there are no further questions. Roberts. Thank you very much. We thank both counsel for your arguments. The case just argued is submitted.
judges: Duffy, Clifton, Bea